**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **HENRY ROBERTSON BARRETT** | : | |
| | : | **Case No. 1:24-cv-00673-DEH** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | |
| | : | **June 25, 2024** |
| **The Arena Group Holdings, Inc. and,** | : | |
| **Manoj Bhargava** | : | |
| | : | |
| **Defendants** | : | |
| | : | **Jury Trial Demanded** |

## AMENDED COMPLAINT

Plaintiff, Henry Robertson Barrett, by and through his attorneys, Pullman & Comley, LLC, respectfully alleges as follows:

## PARTIES

1.      Plaintiff, Henry Robertson Barrett, is a Connecticut citizen residing in Westport, Connecticut.

2.      Upon information and belief, the defendant, Manoj Bhargava ("Bhargava"), is a resident of the State of Michigan with a residence located in Farmington Hills.

3.      Upon information and belief, Bhargava, was the person responsible for Arena Group's operations including the decision to unlawfully terminate Plaintiff's employment and refuse to pay Plaintiff his compensation, bonuses, stock equity, severance, and benefits.

4.      Defendant, The Arena Group Holdings, Inc. ("the Arena Group"), is a corporation organized under the laws of Delaware with its headquarters and place of business located at 200 Vesey Street, 24th Floor, New York, New York, 10281.

## JURISDICTION AND VENUE

5.      This is an action for breach of contract, breach of the duty of good faith and fair dealing, failure to pay wages under the New York Wage and Hour laws, including double damages and attorney's fees, under NY Labor Laws §198(1-a).  Plaintiff also sues for defamation and other tort claims.

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in that this is a civil action between a corporation with a place of business located in the State of New York and a citizen of the state of Connecticut, and a citizen of the state of Michigan, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

7.      Venue is proper under 28 U.S.C. §§ 1391(b) and (c).

## FACTS

8.      Mr. Barrett commenced employment with the TheMaven, Inc. as its "President, Media" on or about February 16, 2021.

9.      TheMaven, Inc. and Mr. Barrett entered into a written "Executive Employment Agreement" effective February 16, 2021 (the "Employment Agreement").

10.      Among other things, the Employment Agreement provides for an annual salary, twelve months' severance paid out as salary continuation in the event of Mr. Barrett's termination of employment without Cause, Equity Grants and a Bonus at 100% of base salary as follows:

(i) For each fiscal year of the Term, the Executive shall be eligible to earn an annual bonus (the "Annual Bonus") in accordance with the Company's Executive Bonus Plan (the "Bonus Plan") as in effect on the Effective Date, **with quarterly draws as set forth in the Bonus Plan** and with a Target Bonus Amount (as defined in the Bonus Plan) equal to 100% of Base Salary

2

as in effect on the last day of the applicable year, and based upon the achievement of annual performance goals as described in the Bonus Plan.

Employment Agreement Section 1.2(b).

11.     Mr. Barrett was additionally entitled to receive a "deal close" bonus in the amount of $175,000 for 2023.  (All bonus payments due to Mr. Barrett are collectively referred to as the "Bonus").

12.     The Employment Agreement also provides that the Arena Group is responsible for Mr. Barrett's legal fees incurred by him in any action "against the Company to enforce (his) rights under this Agreement…".

13.     Prior to accepting the role with TheMaven, Inc., Mr. Barrett was the President of Hearst Newspapers Digital for five years where he successfully drove revenue and media content verticals.  Prior to that, Mr. Barrett held various other executive positions including Senior Vice President of Digital for the Los Angeles Times, Executive Vice President of Tribune Interactive, Vice President and General Manager of Yahoo News and Yahoo Finance.  Mr. Barrett performed all of these roles in an exemplary fashion – including his job with the Arena Group.

14.     TheMaven, Inc. focuses on building deep content verticals focused on leveraging iconic name brands such as Sports Illustrated, TheStreet, Parade and Men's Journal, over 40 other owned brands and over 220 publisher partners.

15.     On February 11, 2022, The Arena Group Holdings, Inc., issued a public offering of its stock on the NYSE-American exchange under the symbol AREN, at which time, TheMaven, Inc. became The Arena Group Holdings, Inc. and rebranded itself as "The Arena Group."

16.     As the Arena Group's "President, Media" Mr. Barrett was responsible for vertical revenue and audience growth of over forty brands including Sports Illustrated, TheStreet, Parade and Men's Journal, and over 220 publisher partners. Mr. Barrett successfully drove revenue and audience growth monetization, syndication, new vertical development and acquisitions.

17.     Mr. Barrett succeeded in this position in all respects, driving revenue growth from $80 million annually before Mr. Barrett joined the company to forecasted revenue for 2023 in the amount of $220 million.

18.     In recognition of Mr. Barrett's outstanding performance, effective as of August 1, 2023, the Arena Group entered into the First Amendment to the Executive Employment Agreement between the company and Mr. Barrett (the "Amendment").

19.     Pursuant to the terms of the Amendment, (i) Mr. Barrett's annual salary was increased from $441,000 to $500,000 effective August 1, 2023; (ii) Mr. Barrett received a signing bonus in the amount of $150,000 (less applicable taxes and withholdings), of which $100,000 was payable on or before August 15, 2023 and the balance of $50,000 shall be paid on or before October 15, 2023; and (iii) the company granted Mr. Barrett stock options, restricted stock units or restricted stock awards, as to be agreed upon by the board of directors of the Company and its Chief Executive Officer.

20.     Additionally, on August 14, 2023, the Company entered into a severance side letter agreement with Mr. Barrett (the "Severance Agreement").

21.     The Severance Agreement provides that if the company terminates Mr. Barrett without Cause (as defined in his Employment Agreement with the company), or

4

he terminates his employment for Good Reason (as defined in his Employment Agreement with the company) within twenty-four (24) months following a Change in Control (as defined in the company's 2022 Stock and Equity Compensation Plan), then Mr. Barrett is entitled to receive an amount equal to twelve (12) months of his annual salary as a severance payment (the "Severance Payment"). The Severance Payment shall be payable as salary continuation (less all applicable tax withholdings and deductions) over a twelve (12) month period in accordance with the Company's regular payroll schedule.

22.     The Severance Agreement clearly stated that the "Severance Payment shall be in addition to any payments and benefits to which Executive is eligible under Section 1.3(c) of Executive's Employment Agreement" and is subject to Mr. Barrett's delivery of an effective release of claims against the Company.

23.     Therefore, the total severance to which Mr. Barrett is entitled to receive pursuant to both Agreements is 24 months' pay and benefits.

24.     The Severance Agreement also provided Mr. Barrett the right to continue to participate in all of the Arena Group's health benefits for eighteen months subject to Mr. Barrett's timely election of continuation coverage under COBRA.

25.     In August 2023, Manoj Bhargava, a businessman who founded the caffeine beverage brand 5-Hour Energy, signed a Letter of Intent to acquire a majority stake (approximately 65%) in the Arena Group through one of Bhargava's companies, Simplify Inventions, LLC ("Simplify"). Simplify planned to acquire certain assets of the Arena Group's. As part of the deal, Arena will receive a $50 million investment.  The Arena

Group intended to use a portion of this cash to reduce its debt by $20 million from current levels. The deal is intended to close in January 2024.

26.     In November 2023, the Arena Group announced that it had signed a definitive agreement under which the company will combine with Bridge Media Networks, LLC ("Bridge Media Networks"), a wholly owned subsidiary of Simplify.

27.     Additionally, on November 30, 2023, Simplify purchased Arena Group shares and debt giving Bhargava 44 percent control of the Arena Group.

28.     These transactions effected a Change in Control, as that term is defined in the company's 2019 Stock Equity Incentive Plan, and gave Bhargava control of the company.

29.     On December 5, 2023, without notice and without authority, Mr. Bhargava directed Mr. Grady Tripp, the Arena Group's Head of Human Resources, to terminate the employment of Mr. Barrett as well as the company's Operations President and COO, Andrew Kraft, and its Corporate Counsel Julie Fenster.

30.     At that time, upon information and belief, Bhargava was acting as the company's CEO even though he had never been officially appointed as such by the company's Board of Directors, as the Board did not appoint Bhargava as interim CEO until December 11, 2023.  Bhargava had somehow managed to take over the company without Board approval.

31.     The Company's oral termination of Mr. Barrett's employment without written notice of his termination, violated N.Y. Labor Law § 195(6).

32.     Upon information and belief, Bhargava' termination of Mr. Barrett took place without the knowledge of the actual CEO, Ross Levinsohn, and without a formal

Board action, when Board governance required that the termination had to be done by the CEO and with a Board action.

33.    The following week, the company terminated the employment of the CEO: Levinsohn.

34.    The company publicly announced that the terminations were done "to improve the operational efficiency and revenue of the company," which statement defamed Mr. Barrett relating to his exemplary performance at the Company. https://www.businesswire.com/news/home/20231211378068/en/The-Arena-Group-Announces-Termination-Of-CEO-Ross-Levinsohn-Appoints-Manoj-Bhargava-As-Interim-CEO

35.    Following the termination of these individuals, Bhargava publicly stated that:  "The amount of useless stuff you guys do is staggering."  Which statement again was defamatory and damaging to Mr. Barrett's reputation.

36.    Bhargava, either directly or through an agent of the Arena Group, also confirmed to the media that he "fired two senior executives," Mr. Kraft and Mr. Barrett, "following its recent AI fiasco" involving the Arena Group's use of Artificial Intelligence for Sports Illustrated published material in which for Sports Illustrated "had been publishing affiliate link-laden commerce articles under the bylines of fake writers." This statement again was defamatory and damaging to Mr. Barrett's reputation as Mr. Barrett had no involvement with any alleged use of Artificial Intelligence for Sports Illustrated published material.

37.    Bhargava had no authority to terminate Mr. Barrett because the Arena Group Board of Directors had not approved his appointment as CEO or the termination.

38.     Bhargava also had no authority to publicly comment on the terminations, and certainly no right to disparage Mr. Barrett as part of or after his termination.

39.     Twenty-three days after verbally terminating Mr. Barrett's employment without providing any reason for the termination, on December 28, 2023, Arena Group issued an unsubstantiated termination letter to Mr. Barrett purporting to retroactively set forth reasons for the termination.

40.     That pretextual formal termination letter came after Mr. Barrett informed the company (through his legal counsel), that his termination of employment violated N.Y. Labor Law § 195(6).

41.     The letter false claimed that Mr. Barrett had been terminated for "Cause," but it did not offer any facts to justify that statement.

42.     Indeed the pretextual justification for Mr. Barrett's termination for "Cause" was merely an attempt by the company to evade its contractual obligations under the Employment Agreement and amendments thereto.

43.     The termination letter was defamatory and untrue.

44.     On or about January 5, 2023, the Arena Group accepted the resignation of Bhargava as Interim Chief Executive Officer which resignation occurred because of Bhargava's conflicts of interest in holding the position.

45.     During the three weeks that Bhargava improperly made himself Arena Group's interim CEO he unlawfully fired the company's executives, defamed them both internally and outside of the company, and defaulted on a required licensing payment to maintain the Company's right to publish Sports Illustrated, its most important business;

but Bhargava nonetheless blamed the fired executives, including Mr. Barrett for the company's business failures.

46.     After Bhargava's resignation occurred, on January 23, 2024, Bhargava spoke at an investor conference in Jackson Hole, Wyoming. At this conference Bhargava again disparaged Mr. Barrett and other former Arena Group executives by falsely stating that that the former executives, including Mr. Barrett, lost money for Arena Group.

47.     At all times relevant to this Complaint, Bhargava and Arena Group were joint employers of Mr. Barrett, in that they each controlled Mr. Barrett's work simultaneously, directly or indirectly, for their common interest and enterprise through their common management.

48.     At all times relevant to this Complaint, through his control of Arena Group, Bhargava was the individual with the ultimate authority to authorize the payment of wages to Mr. Barrett.

49.     At all relevant times, Bhargava and Arena Group were each an "employer" of Mr. Barrett within the meaning of NY Labor Law §190(3) and its interpretive case law.

50.     At all relevant times, Mr. Barrett was an employee of Bhargava and the Arena Group within the meaning of NY Labor Law §190(2) and its interpretive case law.

51.     Mr. Barrett performed his duties as required under his Employment Agreement and the Amendment during 2023 in the same excellent manner he had previously performed his duties.

52.     Defendants' termination of Mr. Barrett's employment was not for Cause as defined in the Employment Agreement or the Severance Agreement.

9

53.     Subsequent to Defendants' termination of his employment without cause, Mr. Barrett timely elected continuation of coverage under COBRA.

54.     Subsequent to Defendants' termination of his employment without cause, the Arena Group has failed to offer and provide reimbursement of the COBRA payments due in accordance with the Employment Agreement and Severance Agreement.

55.     Subsequent to Defendants' termination of his employment without Cause, Defendants failed to pay Mr. Barrett the Severance Pay due to him.

56.     Subsequent to Defendants' termination of his employment without Cause, Defendants failed to pay Mr. Barrett's full Bonus that was due to him.

57.     Defendants timed the termination of Mr. Barrett's employment in order to avoid the payment of the Bonus that he otherwise would have been entitled to as of December 31, 2023, because the Employment Agreement required Mr. Barrett to be employed on December 31, 2023 in order to be eligible for the Bonus.

58.     Subsequent to Defendants' termination of his employment without Cause, Defendants failed to provide Mr. Barrett with all existing Equity (vested and unvested), which Equity is to be vested and made exercisable, per the Employment Agreement for a termination without Cause.

## CAUSES OF ACTION

**COUNT ONE – BREACH OF AGREEMENTS (against the Arena Group)**

59.     The Arena Group breached the Employment Agreement, the Amendment and the Severance Agreement (collectively "the Agreements") by failing and refusing to provide Mr. Barrett with the Severance Pay that Arena Group is obligated to pay, and which is now due to him in the amount of $1,000,000.00.

60.     The Arena Group breached the Agreements by failing and refusing to pay Mr. Barrett's Bonus that was due to him.

61.     The Arena Group breached the Agreements by failing and refusing to provide Mr. Barrett with the Equity that the company promised to him.

62.     The Arena Group breached the Agreements by failing and refusing to continue to fund Mr. Barrett's health insurance subsequent to the termination of his employment.

63.     The Arena Group's breach of the Agreements was wanton, willful and/or malicious, in that Arena Group intentionally disregarded its obligation to pay Mr. Barrett his Bonus and Severance Pay and Health benefits.

64.     As a direct result of the Arena Group's breach of the Agreements, Mr. Barrett has suffered and continues to suffer damages.

65.     As a direct result of the Arena Group's breach of the Agreements, Mr. Barrett has incurred attorney's fees and costs of litigation.

**COUNT TWO – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**
**(as to the Arena Group)**

1 – 58.   Paragraphs 1 – 58 of the complaint are incorporated by reference and made Paragraphs 1-58 of Count Two as though fully set forth herein.

66.     Mr. Barrett performed his duties as required under his contract of employment during 2023 in the same manner he had previously performed his duties.

67.     The Arena Group failed to pay the Bonus and Severance Pay and other benefits to Mr. Barrett in breach of the Agreements.

68.     By doing so, the Arena Group failed to act fairly and/or in good faith as required by New York's common law duty of good faith and fair dealing.

69.     As a direct result of the Arena Group's failure to act in good faith, Mr. Barrett has suffered and continues to suffer damages.

## COUNT THREE – FAILURE TO PAY WAGES UNDER THE NEW YORK WAGE AND HOUR LAWS (as to Arena Group)

1 – 58.  Paragraphs 1 – 58 of the complaint are incorporated by reference and made Paragraphs 1-58 of this Count as though fully set forth herein.

70.     The Bonus constitutes wages as defined NY Labor Law §190 and interpretative law.

71.     The Arena Group's failure to pay Mr. Barrett the Bonus violates NY Labor Law §190, et. seq.

72.     The Arena Group's failure to pay Mr. Barrett the Bonus was wanton, willful and/or malicious, in that Arena Group intentionally disregarded his obligation to pay Mr. Barrett the Bonus upon termination of employment.

73.     Pursuant to NY Labor Law §198(1-a), Mr. Barrett is entitled to recover from the Arena Group twice the amount of the Bonus, as well as costs and reasonable attorneys' fees incurred in bringing this action.

74.     As a direct result of the Arena Group's failure to comply with NY Labor Law §190, et. seq, Mr. Barrett has suffered and continues to suffer damages.

75.     As a direct result of the Arena Group's failure to comply with NY Labor Law §190, et. seq, Mr. Barrett has incurred attorney's fees and costs of litigation.

## COUNT FOUR – FAILURE TO PAY WAGES UNDER THE NEW YORK WAGE AND HOUR LAWS (as to Bhargava)

1 – 58.  Paragraphs 1 - 58 of the complaint are incorporated by reference and made Paragraphs 1 -58 of this Count as though fully set forth herein.

76.     The Bonus constitutes wages as defined by NY Labor Laws §190, et. seq, and interpretive law.

77.     Bhargava made the decision not to pay Mr. Barrett the Bonus due to him and controlled the failure to pay Barrett his Bonus.

78.     Under New York law, Bhargava is the Employer for purposes of the failure to pay Mr. Barrett his Bonus.

79.     Bhargava's failure to pay Mr. Barrett the Bonus violates NY Labor Law §190, et. seq.

80.     Bhargava's failure to pay Mr. Barrett the Bonus was wanton, willful and/or malicious, in that Bhargava intentionally disregarded his obligation to pay Mr. Barrett the Bonus upon termination of employment.

81.     Pursuant to NY Labor Law §198(1-a), Mr. Barrett is entitled to recover from Bhargava twice the amount of the Bonus, as well as interest, costs and reasonable attorneys' fees incurred in bringing this action.

82.     As a direct result of Defendant's failure to comply with NY Labor Law §190, et. seq, Mr. Barrett has suffered and continues to suffer damages.

**COUNT FIVE – TORTIOUS INTERFERENCE WITH CONTRACT (as to Bhargava)**

1 – 58.  Paragraphs 1 - 58 of the complaint are incorporated by reference and made Paragraphs 1 -58 of this Count as though fully set forth herein.

83.     Mr. Barrett performed his duties as required under his contract of employment during 2023 in the same manner he had previously performed his duties.

84.     Bhargava was aware of the existence of the Employment Agreement, Severance Agreement and agreement to pay Barrett a Bonus, all of which were valid contracts between Barrett and Arena Group.

85.     Bhargava tortiously interfered with the Employment Agreement, Severance Agreement and agreement to pay Barrett a Bonus by directing Arena Group to terminate Barrett without Board approval in contravention of Arena's by-laws and Delaware law, causing the Arena Group to refrain from paying Barrett the Severance Payment, salary continuation, Annual Bonus, stock options, restricted stock units, COBRA benefits and other compensation and benefits to which Barrett is entitled due to the "without cause" termination of his employment.

86.     Upon information and belief, Cavitt Randall—a Board member of Arena Group and also an employee of companies under the control of Bhargava—stated to other Arena Group executive that Bhargava will "never approve" the payout of severance in the amount set forth in the Employment Agreement.

87.     Bhargava intentionally and improperly interfered with Arena Group's payment of the Severance Payment, his salary continuation, Annual Bonus, stock options, restricted stock units, COBRA benefits and other compensation and benefits to which Barrett is entitled pursuant to his Employment Agreement and Severance Agreement.

88.     Bhargava intentionally and improperly procured the breach of the contract and thereby tortiously interfered with Barrett's agreements with Arena Group.

89.     As a direct result of Bhargava's tortious interference with Barrett's agreements with Arena Group, Mr. Barrett has suffered and continues to suffer damages.

**COUNT SIX – DEFAMATION (as to Bhargava)**

1 – 58.  Paragraphs 1 - 58 of the complaint are incorporated by reference and made Paragraphs 1 -58 of this Count as though fully set forth herein.

90.    The company publicly announcing that Mr. Barrett's termination was done "to improve the operational efficiency and revenue of the company" was defamation per se in as much it implied that Mr. Barrett was not efficient or improving company revenue.

91.    Bhargava publicly stating that Mr. Barrett should "stop doing dumb stuff" was that he did "useless" things was defamation per se.

92.    Bhargava stating that he "fired" Mr. Barrett following the company's "recent AI fiasco" was defamation per se in as much as Mr. Barrett had no involvement with the use of Artificial Intelligence for Sports Illustrated published material.

93.    As a direct result of Bhargava publicly defaming Mr. Barrett, Mr. Barrett has suffered and continues to suffer damages.

94.    As a direct result of Bhargava publicly defaming Mr. Barrett, Mr. Barrett has incurred attorney's fees and costs of litigation.

**COUNT SEVEN – DEFAMATION (as to The Arena Group)**

1 – 58.  Paragraphs 1 - 58 of the complaint are incorporated by reference and made Paragraphs 1 -58 of this Count as though fully set forth herein.

95.    The company publicly announcing that Mr. Barrett's termination was done "to improve the operational efficiency and revenue of the company" was defamation per se in as much it implied that Mr. Barrett was not efficient or improving company revenue.

96.    Bhargava publicly stating that Mr. Barrett should "stop doing dumb stuff" was that he did "useless" things was defamation per se.

97.    Bhargava stating that he "fired" Mr. Barrett following the company's "recent AI fiasco" was defamation per se in as much as Mr. Barret had no involvement with any alleged use of Artificial Intelligence for Sports Illustrated published material.

98.    Bhargava made these statements in his capacity as an employee, officer director, shareholder and executive of the Arena Group.

99.    As a direct result of the Arena Group's publicly defaming Mr. Barrett, Mr. Barrett has suffered and continues to suffer damages.

100.    As a direct result of the Arena Group's publicly defaming Mr. Barrett, Mr. Barrett has incurred attorney's fees and costs of litigation.

**WHEREFORE**, the Plaintiff claims the following relief:

1.    Money damages;

2.    Double damages pursuant to NY Labor Law §198(1-a);

3.    Common law punitive damages for Defendants' wanton, willful, and/or malicious malfeasance;

5.    Attorneys' fees and costs pursuant to Conn. NY Labor Law §198(1-a) and the Employment Agreement;

6.    Damages due to Defendants' defamation per se.

7.    Attorney's fees due to Defendants' defamatory conduct

8.    Prejudgment and post-judgment interest; and

9.    Such other and further relief as the Court may deem proper.

**The Plaintiff seeks a jury trial for all claims eligible to be decided by a jury.**

PLAINTIFF,
HENRY ROBERTSON BARRETT

By: */s/ Joshua A. Hawks-Ladds*
    Joshua A. Hawks-Ladds (JH3306)
    E-mail: jhawks-ladds@pullcom.com
    Melinda Kaufmann (adm. pro hac vice)
    Mkaufmann@pullcom.com
    Pullman & Comley, LLC
    90 State House Square
    Hartford, CT  06103
    Tel:  860-541-3306
    Fax:  860-424-4370
    His Attorneys

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on this 25th day of June 2024, a copy of the foregoing was served on counsel of record for all Parties via electronic filing on:

Kerstin M. Miller, Esq.
Adam M. Meehan, Esq.
Smith & Downey, p.a.
320 E. Towsontown Blvd., Suite 1E
Baltimore, MD 21286
kmiller@smithdowney.com
ameehan@smithdowney.com


Eric Pelton, Esq.
Lauren Walas, Esq.
Kienbaum Hardy Viviano Pelton & Forrest, P.L.C.
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI 48009
epelton@khvpf.com
lwalas@khvpf.com


    */s/ Joshua A. Hawks-Ladds*
    Joshua A. Hawks-Ladds